**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FLEISCHER STUDIOS, INC.,
  *Plaintiff-Appellant,*

v.

A.V.E.L.A., INC., DBA Art & Vintage Entertainment Licensing Agency; ART-NOSTALGIA.COM, INC; X ONE X MOVIE ARCHIVE, INC; BEVERLY HILLS TEDDY BEAR CO.; LEO VALENCIA,
  *Defendants-Appellees.*

No. 09-56317

D.C. No.
2:06-cv-06229-
FMC-MAN

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
November 2, 2010—Pasadena, California

Filed August 19, 2011

Before: J. Clifford Wallace and Susan P. Graber, Circuit
Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge Wallace;
Dissent by Judge Graber

---

*The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

11031

## COUNSEL

Robert P. LoBue (argued), Gloria C. Phares, A. Leah Vickers of Patterson Belknap Webb & Tyler LLP, New York, New York, and Rex S. Heinke of Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California, for appellant Fleischer Studios, Inc.

Douglas D. Winter (argued) of The Ball Law Firm, LLP, Los Angeles, California, for appellees A.V.E.L.A., INC., DBA Art & Vintage Entertainment Licensing Agency; et al.

## ORDER

The Opinion filed February 23, 2011, and published at 636 F.3d 1115 (9th Cir. 2011), is hereby withdrawn and superceded by the Opinion filed concurrently herewith.

With the filing of the new opinion, Appellant's pending petitions for rehearing and rehearing en banc are DENIED as moot, without prejudice to refiling a subsequent petition for rehearing and/or rehearing en banc. *See* 9th Cir. G.O. 5.3(a).

## OPINION

WALLACE, Senior Circuit Judge:

This appeal stems from the district court's summary judgment dismissing Fleischer Studios, Inc.'s (Fleischer) copyright and trademark infringement action. The district court ruled that Fleischer held neither a valid copyright nor a valid trademark in the Betty Boop cartoon character and thus lacked standing to sue. Fleischer appeals. The district court had jurisdiction pursuant to 28 U.S.C. § 1338(a), and our jurisdiction arises under 28 U.S.C. § 1291. We affirm.

## I.

Betty Boop "combined in appearance the childish with the sophisticated—a large round baby face with big eyes and a nose like a button, framed in a somewhat careful coiffure, with a very small body." *Fleischer Studios v. Ralph A. Freundlich, Inc.*, 5 F. Supp. 808, 809 (S.D.N.Y. 1934). Betty Boop was the creation of Max Fleischer, then head of Fleischer Studios, Inc. (Original Fleischer). Beginning in 1930, Original Fleischer developed a number of cartoon films featuring Betty Boop. For a time, Original Fleischer licensed the Betty Boop image for use in toys, dolls, and other merchandise. Approximately ten years after creating her, Original Fleischer abandoned Betty Boop and sold its rights to both her cartoons and her character. Soon after, in 1946, Original Fleischer was dissolved.

Max Fleischer's family attempted to revive the Fleischer cartoon business in the early 1970s. The family incorporated its new entity under the same name as Original Fleischer and attempted to repurchase the intellectual property rights to the Betty Boop character. To be clear, Fleischer, the plaintiff in this action, is a distinct and separate entity from the now defunct Original Fleischer which first owned Betty Boop.

Fleischer believes that its intellectual-property-rights purchases have made it the exclusive owner of the Betty Boop character copyright and trademark. Based on this belief, Fleischer licenses the Betty Boop character for use in toys, dolls, and other merchandise. This merchandise has reached such a high level of popularity that even drug dealers have been known to use it. *See United States v. Lakoskey*, 462 F.3d 965, 971 (8th Cir. 2006) ("A search warrant was issued, and the package was opened pursuant to that warrant on January 26, 2004. The package contained a large ceramic Betty Boop doll, with four concealed, separately wrapped plastic bundles of high-purity-level methamphetamine inside").

The defendants in this action, A.V.E.L.A., Inc., Art-Nostalgia.com, Inc., X One X Movie Archive, Inc., and Leo Valencia (collectively, A.V.E.L.A.), also license Betty Boop merchandise. The copyright pursuant to which A.V.E.L.A. licenses its products is based on vintage posters featuring Betty Boop's image that A.V.E.L.A. has restored.

During summary judgment proceedings before the district court, the parties disputed whether Fleischer owned an exclusive copyright to the Betty Boop character. Fleischer asserted that its ownership of the copyright, which was first owned by Original Fleischer, arises through several alternative chains of title. Only one chain is relevant here, however, because Fleischer has abandoned the others on appeal. The purported title chain is as follows: Original Fleischer transferred its rights to Paramount Pictures, Inc. (Paramount) in 1941; Paramount transferred those rights to UM&M TV Corp. (UM&M) in 1955; in 1958, UM&M transferred these rights to National Telefilm Associates, Inc. (NTA), which became Republic Pictures in 1986; and finally, Republic Pictures transferred the exclusive copyright to Fleischer in 1997.

A.V.E.L.A. disputed this alleged chain of title, arguing that there was no admissible evidence to establish each link in the chain with the exception of the transfer from Original Fleis-

cher to Paramount. The district court agreed and held that Fleischer failed to satisfy its burden of proof regarding the transfer of rights from UM&M to NTA and from NTA to Republic Pictures.

The district court also dismissed Fleischer's trademark infringement claim, holding that Fleischer failed to submit proper evidence of a registered federal trademark in the Betty Boop image, and, although it had evidence of a registered federal trademark in the name "Betty Boop," the fractured ownership and use of that mark destroyed Fleischer's trademark rights. The court further held that Fleischer did not establish that it owned common-law trademarks in Betty Boop's name or image.

There is no doubt that a separate Betty Boop character copyright exists. Although there is no evidence in the record that Original Fleischer filed a copyright registration for the Betty Boop character, that is of no moment. Because all of the copied works were created before 1978, both parties agree that the Copyright Act of 1909 (1909 Act) applies to the copyrights at issue in this litigation. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1325 (9th Cir. 2000). Under section 3 of the 1909 Act:

> The copyright provided by this title *shall protect all the copyrightable component parts of the work copyrighted*, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon composite works or periodicals shall give to the proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this title.

17 U.S.C. § 3 (repealed) (emphasis added); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175-76 (9th Cir. 2003)

("[C]haracters that are 'especially distinctive' or the 'story being told' receive protection apart from the copyrighted work", *citing Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir. 1988)).

The parties agree that Betty Boop became a separate copyrightable component of one of Original Fleischer's 1930 films, and we accept that concession for the purposes of this appeal. *Shivers v. Amerco*, 670 F.2d 826, 832 n.3 (9th Cir. 1982); *see also Rice*, 330 F.3d at 1175-76. The logical result of this concession is that Original Fleischer owned "all the rights in respect [to Betty Boop] which [it] would have if" it had individually copyrighted it.[1] 17 U.S.C. § 3; *Kaplan v. Fox Film Corp.*, 19 F. Supp. 780, 781 (S.D.N.Y. 1937).

Fleischer now appeals, objecting to both the district court's copyright and trademark rulings. We review the district court's summary judgment de novo. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

## II.

**[1]** Fleischer bears the burden of proving copyright ownership. *Litchfield v. Spielberg*, 736 F.2d 1352, 1355 (9th Cir. 1984) ("To prove copyright infringement, the plaintiff must show . . . ownership of the copyright . . ."). As mentioned earlier, Fleischer asserts ownership of a copyright in the Betty Boop character through the following chain of title: Original

---

[1]Fleischer cites *Walt Disney Productions v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978), in support of its conclusion that there is no stand-alone copyright to Betty Boop the character. Fleischer is correct that *Walt Disney* held that character copyrights may be created as component parts of a film or cartoon booklet. *Id.* at 754. But that holding does not lead to the conclusion that once created, the character copyright cannot be transferred or sold separately from the copyright-creating work. Given the clear language of section 3 of the 1909 Act and the absence of an on-point binding precedent, we disagree with Fleischer's conclusion that *Walt Disney* controls this issue.

Fleischer to Paramount to UM&M to NTA to Republic Pictures to Fleischer. Because this complete chain is necessary to establish ownership, Fleischer's copyright action requires it to establish each link.

[2] It is undisputed that in 1941 Paramount obtained from Original Fleischer the rights to both the Betty Boop character and numerous Betty Boop cartoons. What is disputed, however, is whether Paramount then transferred the Betty Boop character to UM&M. Fleischer argues that it did so by a 1955 purchase agreement that stated, in part:

> Paramount hereby grants and assigns to [UM&M] all of Paramount's right, title and interest in and to said Photoplays [of Betty Boop] which are deliverable by Paramount to [UM&M] hereunder and do not revert to Paramount under Paragraph 11 hereof, hereinafter for convenience referred to as "Sold Photoplays", any copyrights subsisting therein, the literary material upon which they are based and the instruments whereby Paramount acquired its right, title and interest in and to such literary material . . . .

[3] However, a key provision in that same agreement carved out the transfer of the characters in those Sold Photoplays:

> *Anything to the contrary notwithstanding, no grant or assignment is made hereunder to [UM&M] of the characters and characterizations contained in said Sold Photoplays or said literary material, or of the copyrights in said characters or characterizations, or of any production or other rights in said characters and characterizations, or to use said characters and characterizations or the names of said characters or trade names, trademark and names of the series of Sold Photoplays* or of said literary material in any manner except . . . only as part of the particu-

lar Sold Photoplay in which they or any of them are contained . . . .

(emphasis added)

In other words, the purchase agreement explicitly provided that the right to the Betty Boop character copyright was retained by Paramount, rather than transferred to UM&M. The "[a]nything to the contrary notwithstanding" clause is unambiguous. *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section").

**[4]** The "doctrine of indivisibility" has no impact on this conclusion. "[T]he doctrine of indivisibility is a judge-made rule that relates primarily to standing." *Abend v. MCA, Inc.*, 863 F.2d 1465, 1469 (9th Cir. 1988), *aff'd on other grounds sub nom.*, *Stewart v. Abend*, 495 U.S. 207 (1990). "Under the doctrine, a 'licensee' of a copyright—i.e., someone who holds only partial copyright privileges—may not copyright a work in the licensee's name." *Id.* Fleischer argues that if, as we hold here, Paramount retained the copyright to the Betty Boop character but transferred the copyright to the films to UM&M, the doctrine of indivisibility would have prevented UM&M from renewing its copyright. That renewal-blocking result is evidence, according to Fleischer, that neither party intended to separate the Betty Boop character and film rights. "At most," Fleischer states, "Paramount may have retained a *contractual* right (or license back) to exploit the character apart from the films."

**[5]** Fleischer is mistaken. Under the 1909 Act, the doctrine of indivisibility may have prohibited a copyright owner from renewing his or her copyright if, for example, he or she had previously sold the magazine-publishing rights to his or her

story. *Id.*[2] Or, because the law abhors a forfeiture, a court would deem the purported owner of the magazine-publishing rights to be a mere licensee, thereby allowing the author to renew the copyright. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1145 (9th Cir. 2008). But that is not the scenario here. Through the UM&M agreement, UM&M obtained the " 'totality of rights commanded by copyright' " for the Betty Boop films, *id., quoting Gardner v. Nike, Inc.,* 279 F.3d 774, 778 (9th Cir. 2002); what it did not obtain were the rights to the Betty Boop character. While the doctrine of indivisibility may have prohibited UM&M from renewing the film copyright if, for example, it did not obtain the DVD distribution rights to the Betty Boop films it purchased, the doctrine would have had no impact on UM&M's attempt to renew its copyright if it did not own a character copyright component part of the film. *See Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 976 (9th Cir. 2008) (renewal of motion picture permitted without owning all component parts); *cf. Self-Realization Fellowship Church*, 206 F.3d at 1325 ("[A] blanket copyright gives a magazine publisher rights in an individual contribution only if the publisher owns the common law copyright as the author of the contribution, or as the author's assignee", *citing Mail & Express Co. v. Life Pub. Co.*, 192 F. 899 (2d Cir. 1912)). In short, the doctrine of indivisibility does not deprive copyright holders of the right to transfer or, in this case, retain the component parts of their copyrights. If we held otherwise, we would be directly contra-

---

[2]We use the word "may" because it is far from certain that the doctrine of indivisibility applies to copyright registration or renewals. *See Abend*, 863 F.2d at 1469 (doctrine of indivisibility did not preclude publisher from registering copyright in rights-divided work). Even at the time of the execution of the UM&M agreement, the doctrine's continued vitality in certain contexts was in considerable doubt. *See, e.g.*, *Wodehouse v. Comm'r*, 166 F.2d 986, 989 (4th Cir. 1948) ("[S]erial rights, book rights, dramatic production rights and motion picture rights of a literary production are rights which may be and are separately and effectively bought and sold in the literary market"), *overruled on other grounds by* 337 U.S. 369 (1949); *Herwig v. United States*, 105 F. Supp. 384, 389 (Ct. Cl. 1952) (similar).

vening section 3 of the 1909 Act by depriving Paramount of "all the rights in respect [to the component part] which [it] would have if each part were individually copyrighted." 17 U.S.C. § 3 (repealed).**³**

**[6]** Contrary to another of Fleischer's arguments, Paramount's conduct subsequent to the execution of the contract does not cast doubt on our conclusion. Fleischer is correct that subsequent conduct can be used in some instances to discern contractual intent. *See Wolkowitz v. FDIC* (*In re Imperial Credit Indus., Inc.*), 527 F.3d 959, 966 (9th Cir. 2008). However, Paramount's subsequent conduct is not evidence of Paramount's intent to transfer the Betty Boop character to UM&M. Paramount did not stand idly by while UM&M renewed the copyrights and profited from ownership of those copyrights. Instead, the record suggests that three years after entering into the UM&M agreement, Paramount transferred its Betty Boop character copyright to Harvey Films. While we have doubts as to whether the use of subsequent behavior in this instance—where the contractual language is unambiguous —is appropriate, *see Wells Fargo Bank & Trust Co. v. McDuffie*, 71 F.2d 720, 728 (9th Cir. 1934), Paramount's subsequent behavior supports our conclusion that it did not transfer the rights to the Betty Boop character copyright by the UM&M agreement.

The dissent states that we are "answer[ing] only half of the issue[ ] by failing to explain what happened to the copyright after it transferred to Harvey Films in the 1950s." Dissent at 11055. That complaint is not well-taken. In this case, the only

---

**³**We are perplexed by the dissent's complaint that, in reaching this conclusion, we have "adopt[ed] a theory rejected by the district court and advanced by neither party on appeal." Dissent at 11055. It is beyond dispute that "[i]f the decision below is correct, it must be affirmed, even if the district court relied on the wrong grounds or wrong reasoning." *Jackson v. S. Cal. Gas Co.*, 881 F.2d 638, 643 (9th Cir. 1989). The law is the law. Regardless of whether the parties correctly interpreted the doctrine of indivisibility, we are still obliged to do so.

issue raised by Fleischer on appeal is whether Fleischer obtained the Betty Boop copyright via the chain of title Original Fleischer to Paramount to UM&M to NTA to Republic to Fleischer. In the district court, Fleischer raised a number of other chain-of-title theories but the district court held all of them to be faulty. By not seeking review of those holdings here, Fleischer has abandoned them. *See Cook v. Schriro*, 538 F.3d 1000, 1014 n.5 (9th Cir. 2008) (issue not raised on appeal is abandoned); *United States v. Gregory*, 322 F.3d 1157, 1160 n.2 (9th Cir. 2003) (same). The dissent cannot resurrect them. It would be patently unfair to A.V.E.L.A. to rule in favor of Fleischer on one of the theories not raised in Fleischer's opening brief. *See Stuard v. Stewart*, 401 F.3d 1064, 1067 (9th Cir. 2005) ("[W]e are not going to construct an argument for the state sua sponte, depriving Stuard's counsel of a fair chance to respond to it").

Perhaps Fleischer should have argued that A.V.E.L.A. waived its character-carveout argument by not asserting it to the district court. *Resolution Trust Corp. v. First Am. Bank*, 155 F.3d 1126, 1129 (9th Cir. 1998) (explaining that issues not raised before the district court are generally forfeited). Perhaps Fleischer does not object to A.V.E.L.A.'s argument on this ground because, as A.V.E.L.A. argues, it raised the issue with sufficient clarity to preserve it. Whatever the reason, Fleischer's failure to argue that A.V.E.L.A. waived this argument requires us to reach its merits. *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) ("this court will not address waiver if not raised by the opposing party" (brackets and internal quotation marks omitted)).

**[7]** Upon review of the merits of A.V.E.L.A.'s character-carveout argument, it is clear that Paramount did not transfer the copyright to the Betty Boop character to UM&M. Because the chain of title is broken, and the only chain of title at issue in this appeal is this one involving UM&M, the district court properly dismissed Fleischer's copyright-infringement claim.

### III.

Fleischer also sued A.V.E.L.A. for trademark infringement. The district court dismissed these claims, holding that Fleischer did not submit timely evidence of a federally registered trademark in the image of Betty Boop, that Fleischer had no common-law trademark rights in that image, and that, although Fleischer did submit evidence that it owned a federally registered trademark in the words "Betty Boop," Fleischer's trademark action was deficient because of the fractured ownership history of Betty Boop-related intellectual property.

### A.

[8] In addressing these rulings, we must first resolve an evidentiary issue related to Fleischer's alleged trademark registration in the image of Betty Boop. During summary judgment proceedings, the district court asked for supplemental briefs on Fleischer's trademark claims. Four days before those briefs were due and well after it first submitted its summary judgment evidence, Fleischer submitted evidence that it owned a federally registered trademark in the image of Betty Boop. Based on its new evidence, Fleischer asserted, for the first time, a new theory of trademark infringement: that A.V.E.L.A. was infringing Fleischer's statutory trademark rights in the Betty Boop image.

A.V.E.L.A. objected both to this new evidence and Fleischer's use of it. The district court, in turn, refused to consider it because "[t]he parties neither sought nor obtained leave to submit additional evidence in support of their claims or arguments." *Fleischer Studios, Inc. v. A.V.E.L.A. Inc.*, 772 F. Supp. 2d 1155, 1163 n.15 (C.D. Cal. 2009). We review that decision for an abuse of discretion. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 845 (9th Cir. 2004).

[9] Federal Rule of Civil Procedure 6(b) requires that "[w]hen an act may or must be done within a specified time,"

a party must file a "motion . . . after the time has expired if the party failed to act because of excusable neglect." The Supreme Court has held that it is never an abuse of discretion for a district court to exclude untimely evidence when a party fails to submit that evidence pursuant to a motion, as Rule 6(b) expressly requires. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 895-98 (1990) ("Perhaps it is true that the District Court could have overcome all the obstacles we have described—apparent lack of a motion, of a showing, and of excusable neglect—to admit the affidavits at issue here. But the proposition that it was *compelled* to receive them—that it was an abuse of discretion to *reject* them—cannot be accepted"). Fleischer's untimely evidence falls directly within this holding. The Central District of California's Local Rule 7-5, titled "Moving Papers," states that "[t]here shall be served and filed with the notice of motion: . . . (b) The evidence upon which the moving party will rely in support of the motion." By submitting its evidence with its supplemental brief, as opposed to with its original motion for summary judgment, and by failing to file a motion to show cause why its neglect was excusable, Fleischer failed to comply with Local Rule 7-5 and Federal Rule of Civil Procedure 6(b). Thus, the district judge did not abuse her discretion in refusing to consider Fleischer's proposed evidence. *See Lujan*, 497 U.S. at 898.

**[10]** We are not done with the alleged Betty Boop image trademark registration, however, because Fleischer now asks us to take judicial notice of it. The problem here is that Fleischer does not account for our holding in *Jespersen v. Harrah's Operating Co.*, which stated "Our rules . . . provide that a plaintiff may not cure her failure to present the trial court with facts sufficient to establish the validity of her claim by requesting that this court take judicial notice of such facts." 444 F.3d 1104, 1110 (9th Cir. 2006) (en banc); *see also Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1000 (9th Cir. 2006) ("It is rarely appropriate for an appellate court to take judicial notice of facts that were not before the district court" (internal quotation marks omitted)). We therefore

decline to take judicial notice of the Betty Boop image trademark registration.

**B.**

**[11]** Fleischer's failure to provide timely evidence of a federal registration in Betty Boop's image, while detrimental to Fleischer's trademark claim, does not completely resolve it. Under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), a claimant may still prove the validity of an unregistered mark. Without a federal registration, however, the claimant loses out on the presumption of validity that registration confers. *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th Cir. 1981).

**[12]** To succeed without the presumption of validity, Fleischer must show "that the mark has become identified with the manufacturer by acquiring a 'secondary meaning.' " *Id.* "The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] emanate from or are associated with the same source." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 820 (9th Cir. 1980).

**[13]** Fleischer's only evidence of secondary meaning comes from the declaration of its Chief Executive Officer (CEO) in which he attests to Fleischer's presence at trade shows, its numerous licensees, and Betty Boop's increasing commercial success. The problem with this evidence is its origin. "Evidence of secondary meaning from a partial source possesses very limited probative value." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1152 (9th Cir. 1999); *see also id.* ("trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark" (brackets and internal quotation marks omitted)). The probative value of such evidence is so limited, in fact, that standing alone, it is not sufficient to withstand

summary judgment. *Id.* Thus, the company CEO's "uncorrob-orated, and clearly self-interested testimony did not create a genuine issue for trial as to whether [Betty Boop] has acquired secondary meaning." *Id.*

## C.

Unlike the alleged image trademark, Fleischer has submit-ted proof that it possesses registered trademarks in the words "Betty Boop." Not content with this evidence, Fleischer again seeks to supplement the record, this time with documents that allegedly establish that Fleischer's word mark has achieved "incontestable" status. After evaluating Fleischer's arguments for the documents' inclusion, we will not consider Fleischer's supplemental evidence for the same reasons we declined to consider its other untimely trademark evidence.

Moving from the procedural to the substantive, the district court held that the "fractured" history of intellectual property rights in works featuring Betty Boop precludes Fleischer from proving secondary meaning—one of the elementary features of an enforceable trademark that is necessary to demonstrate association of the mark with a single producer. *See Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 269 (2d Cir. 1968) ("It is elementary that the function of a trademark is to indicate the origin of the products to which it is attached").

The fractured history theory that served as the basis for the district court's ruling is one that neither this nor any circuit has yet adopted. It originated in *Universal City Studios, Inc. v. Nintendo Co.*, where the district court held that when a trademark is copyrighted and extensively used by many firms, there can be no secondary meaning in it and thus no trade-mark rights. 578 F. Supp. 911, 923-25 (S.D.N.Y. 1983). Applying that theory, the court held that the plaintiff's trade-mark rights, if any, in the image of Godzilla were unenforce-able. *Id.*

**[14]** We agree that the fractured ownership of a trademark may make it legally impossible for a trademark holder to prove secondary meaning, but we disagree that the facts here establish, as a matter of law, that the theory applies. From a logical standpoint, the mere fact of fractured ownership is not, by itself, conclusive evidence of a lack of secondary meaning. There must be something more. In *Universal*, that something more was the evidence of extensive use and licensing of similar images by other companies, the oddly-defined trademark that was legally carved out from other images of the same character, the widespread confusion amongst potential licensees and licensors regarding from whom one should license the mark, and the other image of the same character that had acquired secondary meaning. *Id.* at 924-25. All of these facts led to the conclusion that there could be no secondary meaning.

Unlike the facts in *Universal*, those at issue here merely show that more than one entity owns rights to use Betty Boop-related intellectual property. As the district court stated,

> Here, as in *Universal*, merchandising intellectual property rights in a famous fictional character were divided and parceled out to various entities over many decades. . . . *Although there is no evidence of other current, authorized uses of Betty Boop trademarks*, [Fleischer] acknowledges that other entities retain copyrights in various Betty Boop works.

*Fleischer Studios*, 772 F. Supp. 2d at 1171 (emphasis added).

**[15]** Without the evidence of the type present in *Universal*—confusion in the marketplace regarding who owns the Betty Boop image, "extensive merchandising use of [other Betty Boop] images," or other images of Betty Boop that have acquired secondary meaning, 578 F. Supp. at 925—all we have is the possibility that other copyright owners may be destroying the secondary meaning in the Betty Boop mark.

That possibility is not enough to rule in favor of A.V.E.L.A. on summary judgment. We thus agree with Fleischer that the district court erred on this issue.

**[16]** The district court stated, without explanation, two other reasons for ruling against Fleischer. It stated that there was no evidence "(b) that any of [A.V.E.L.A.'s] uses of its poster artwork represent a use of [Fleischer]'s word mark in commerce, or (c) that any of [A.V.E.L.A.'s] uses of the word mark are likely to cause consumer confusion." *Fleischer Studios*, 772 F. Supp. 2d at 1170. Given the large number of complex issues it faced and the minimal assistance from the parties' briefs, it is understandable that the district court might have deemed it unnecessary to address these issues in greater depth, to provide more detailed reasoning, to cite to relevant authority, or to identify a basis in the record for these apparent conclusions. Nonetheless, because we are unable to ascertain a legal basis for the district court's reasoning on the current record, we conclude that more is necessary. We therefore vacate the holding on this issue and remand to the district court for further proceedings on Fleischer's trademark infringement claims regarding the Betty Boop word mark.

The parties shall bear their own costs.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

---

GRABER, Circuit Judge, dissenting:

I respectfully dissent.

The beginning and the ending of this story are undisputed. Max Fleischer created the lovable character Betty Boop in the 1930s. In 1941, he sold to Paramount Pictures the copyright

to certain cartoons and to the character Betty Boop herself. Max Fleischer died in 1972.

After Fleischer's death, some of his descendants incorporated Fleischer Studios, which is Plaintiff here. Part of Plaintiff's plan was to bring back into circulation the character Betty Boop. Carrying out that plan, Plaintiff purchased the rights to Betty Boop from various entities in the 1980s and 1990s. When Defendants began selling Betty Boop merchandise, Plaintiff brought this action alleging, among other things, copyright infringement.

Plaintiff must establish the chain of title of the copyright to the character Betty Boop. It is undisputed that Paramount owned the copyright as of 1941. The dispute focuses on the chain of title between Paramount and Plaintiff. In the district court, Plaintiff argued, primarily, that Paramount sold the copyright in 1955 to UM&M TV Corporation, which eventually sold it to Plaintiff. Plaintiff argued, alternatively, that even if Paramount did not sell the copyright to UM&M, Paramount sold the copyright in 1958 to Harvey Films, which eventually sold the copyright to Plaintiff. In other words, one chain of title leads through UM&M and another leads through Harvey Films, but both paths lead to Plaintiff.

### A.  *The District Court's View: Copyright Transferred to UM&M*

The district court held that Paramount sold the copyright to UM&M in 1955. The district court held, however, that the post-1950s link between UM&M and Plaintiff was broken, largely because of the court's evidentiary rulings. Plaintiff appealed.

On appeal, Plaintiff made precisely the arguments one would expect: The district court erred in its evidentiary rulings and in its conclusion that the link between UM&M and Plaintiff was broken. In their answering brief, Defendants

defended the district court's holdings on those points. In my view, Plaintiff is correct that the district court erred. For example, the relevant statements in the 1997 settlement agreement qualify as an exception to hearsay under Federal Rule of Evidence 803(15) and establish the link between UM&M and Plaintiff.

In sum, if the copyright transferred to UM&M, Plaintiff prevails.

### B. *Defendants' New Theory: Copyright Transferred to No One*

Defendants also raised an entirely new theory. They argued that the district court erred in concluding that Paramount sold the copyright to UM&M. Defendants argued that, because of the doctrine of indivisibility, the copyright passed *neither to UM&M nor to Harvey Films*; instead, the copyright entered the public domain by virtue of Paramount's failure to renew the copyrights to certain cartoons.

Defendants' argument fails on its own terms. Even if the doctrine of indivisibility applied, as Defendants assert, the copyright nevertheless transferred to UM&M.[1] In short, even if we accept Defendants' premise, it does not change the result: The copyright transferred to UM&M. Because, as explained above, the copyright then passed from UM&M to Plaintiff, Plaintiff prevails.

---

[1]Because the majority, too, rejects Defendants' argument, I do not explain in detail how the doctrine of indivisibility would operate. Briefly, Defendants' explanation for how the doctrine would operate would be contrary to the parties' subsequent conduct, whereas an alternative interpretation is consistent with the parties' subsequent conduct and leads to the conclusion that the copyright transferred to UM&M. *See Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 966 (9th Cir. 2008) ("As with any contract, our goal is to give effect to the mutual intent of the parties . . . [which permits examination of] the subsequent conduct of the parties.").

C.  *The Majority's View: Copyright Transferred to Harvey Films*

The majority strikes out on its own and adopts a position rejected by the district court and advanced by neither party on appeal. The majority holds that Paramount did not sell the copyright to UM&M but instead sold it to Harvey Films. *See* maj. op. at 11043 ("Paramount transferred its Betty Boop character copyright to Harvey Films.").[2] But the majority's analysis stops mid-stream. Plaintiff argued, before the district court and on appeal, that if the copyright transferred to Harvey Films, then Plaintiff prevails because Harvey Films later sold the copyright to Plaintiff.

The majority inexplicably fails to respond to that theory, asserting only that Plaintiff waived the argument that it possesses the copyright via the Harvey Films chain of title. I disagree with the majority's assertion for four reasons.

First, it is true that Plaintiff did not raise the Harvey Films chain of title in its opening brief. But its failure in that regard is perfectly understandable. The district court had ruled in Plaintiff's favor on every link in the UM&M chain except one. Plaintiff thus challenged only the portion of the district court's opinion in which Plaintiff lost. That strategy makes particular sense because Defendants had never before advanced the argument made in their answering brief. Furthermore, after Defendants did advance a new argument, Plaintiff immediately retorted, in its reply brief, that even if

---

[2]The majority reaches that result by concluding that the doctrine of indivisibility does not apply in these circumstances. I am uncertain whether the doctrine of indivisibility applies here. *Compare Kaplan v. Fox Film Corp.*, 19 F. Supp. 780, 781-82 (S.D.N.Y. 1937) (stating that indivisibility does not apply in circumstances similar to the circumstances here), *with Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 886 (9th Cir. 2005) (en banc) (suggesting that indivisibility applied before the 1976 change in copyright laws). Even if the majority is correct, however, Plaintiff nevertheless prevails for the reasons stated in text.

the doctrine of indivisibility applied, Plaintiff prevails via the Harvey Films chain of title.[3] I see nothing to be gained from encouraging litigants to protect against the waiver doctrine by asserting, pro forma, in their opening briefs any and all possible theories of victory, in the possible event that the opposing party will raise a completely new argument in its answering brief.

Second, the majority uses the waiver doctrine as both a sword and a shield. Immediately after holding that Plaintiff waived this argument, maj. op. at 11043-44, the majority excuses Defendants from having failed to raise a "doctrine of indivisibility" argument, on the ground that Plaintiff waived the waiver, *id.* at 11044. It is unclear to me why similar reasoning does not apply to the majority's theory of the case, because the majority adopts a theory advanced by *neither party* on appeal. That is, an argument advanced before the district court and on appeal is ignored, while a wholly new theory advanced by neither party prevails.

Third, as a matter of discretion, I would reach the Harvey Films chain of title. The basic question raised by this appeal is the ownership of the copyright. I see nothing to be gained, and no unfair advantage to be conferred, by resolving this issue to the present day, rather than arbitrarily stopping our analysis as of the 1950s.

Finally, if we are to adhere strictly to the doctrine of waiver, then I would address only the issues raised by the par-

---

[3]The background rule is that we may affirm the district court on any ground supported by the record. *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 878 (9th Cir. 2010). Accordingly, when the appellant argues that the district court erred at a particular step in the analysis, the appellant reasonably may rely on the district court's rulings *in its favor* on the other steps in the analysis. If the appellee then asserts that the district court erred at one of those steps, the appellant is free to respond that it wins even under the theory advanced by the appellee. A contrary rule would lead, as noted in text, to formalistic and repetitive briefing by the appellant.

ties. Plaintiff argues that the district court erred in its analysis of the UM&M chain of title. I agree. Defendants argue that the copyright transferred to no one. I, as does the majority, disagree. If we were to address only the parties' arguments, we would stop there. I would not reach the line of reasoning invented by the majority.

In conclusion, the majority adopts a theory rejected by the district court and advanced by neither party on appeal. Worse still, the majority answers only half of the issue, by failing to explain what happened to the copyright after it transferred to Harvey Films in the 1950s.

D.   *Conclusion*

If the copyright transferred to UM&M, as the district court held, then Plaintiff prevails because UM&M sold the copyright to Plaintiff. If the copyright transferred to Harvey Films, as the majority holds, then Plaintiff prevails because Harvey Films sold the copyright to Plaintiff. There is no support for the novel argument advanced by Defendants that the copyright transferred neither to UM&M nor to Harvey Films. Accordingly, I would reverse the district court's grant of summary judgment to Defendants on the copyright claim.[4]

---

[4]I do not disagree with the majority's analysis of the trademark issue. But the trademark and copyright claims are related. Because of the potential interplay between the doctrines, the district court ruled on the trademark claims only after it had rejected Plaintiff 's copyright claim. In light of the district court's errors concerning the copyright claim, I would vacate the district court's trademark decision and remand for reconsideration, if necessary, in light of the correct copyright analysis.